UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ENTERED

MAY 09 2008

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | |
|---|---|
| SHELBY INDUSTRIAL PARK, INC., JOE BAIRD, RANDALL ROBINSON, RANDY'S AUTO SALES, LLC, ANTHONY J. BAIRD, TIM BAIRD, DEREK BROWN, GILL HADDIX, RODNEY R. JEFFRIES, WILLIAM E. NOAH, VICTOR NOEL, and MARY C. SCOTT, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. 1:06-cv-1150-DFH-WTL ) |
| CITY OF SHELBYVILLE, SHELBYVILLE POLICE DEPARTMENT, OFFICER JAMES MICHAEL McCRACKEN, CITY OF INDIANAPOLIS, INDIANAPOLIS POLICE DEPARTMENT, JAMES BEARD, NATIONAL CRIME INSURANCE BUREAU, OFFICER DAVID SCOTT, OFFICER JOHN RENBARGER, CAPTAIN RICK JOSEPH, DETECTIVE BRYAN REED, and DETECTIVE MARTHA HIGDON, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This is not your average section 1983 Fourth Amendment case.   On February 9, 2005, five police officers from Shelbyville and Indianapolis, assisted by one private investigator, executed a search warrant at an industrial park in Shelbyville, Indiana. The officers were looking for an antique 1937 Lincoln Zephyr to determine whether its identification number had been altered.   During the

search, eleven identified people and an unidentified group of Amish workers were detained. One officer used a submachine gun to hold six plaintiffs and the Amish workers at gunpoint during the search. The officers found no evidence of a crime during the search. Ten individuals and two businesses then filed this suit against six police officers, two cities, and the private investigator and his employer. Plaintiffs allege violations of their federal Fourth Amendment rights and of state law. Defendants have moved for summary judgment on all claims.

As explained below, the claims that survive summary judgment are (1) plaintiff Randall Robinson's Fourth Amendment claim against Officer James Michael McCracken and James Beard for the alleged illegal search of Robinson's boat; (2) the claims of plaintiffs Joe Baird, Anthony Baird, Rodney Jeffries, Derek Brown, Gill Haddix, and Victor Noel under section 1983 for unreasonable detention against Officer Renbarger for using a submachine gun to detain them and the parallel claim under state law against the city of Shelbyville; and (3) the claims of the corporate plaintiffs, Robinson, and Joe Baird for state law trespass against James Beard and the National Insurance Crime Bureau. The qualified immunity defenses of Officers McCracken and Renbarger on the federal claims depend on disputed facts, so they are not entitled to summary judgment on these surviving claims.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

*Facts for Summary Judgment*

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to plaintiffs as the non-moving side. *Reeves*, 530 U.S. at 150. Joe Baird and Randy Robinson jointly owned the Shelby Industrial Park in Shelbyville, Indiana. The park included a multi-storied brick building composed of several sections and additions, totaling 180,000 square feet. One of the sections contained offices for Baird, Robinson, and an office manager. A sign outside the offices read "Randy's Auto Sales." Robinson Dep. 17. A door at the back of the offices led to the warehouse portions of this main structure, which Baird and Robinson rented to various tenants. In early February 2005, Baird and Robinson were storing cars, trucks, and a boat in an unoccupied 44,000 square foot space in the warehouse.

Baird and Robinson also owned several other companies, some jointly and some individually, headquartered at the industrial park. Robinson independently owned Randy's Auto Sales, a private automobile body shop and resale business. *Id.* at 9-10. Despite the sign outside the offices in the main building, Robinson operated Randy's Auto Sales out of one of three separate buildings near but not connected to the main warehouse. Baird operated his own body shop for antique cars and motorcycles in a second separate building adjacent to Robinson's shop. Baird and Robinson jointly used the third separate building to house a frame

-4-

straightening machine and a paint shop. All of the businesses shared a telephone line, but Baird had a separate unlisted line that rang in his shop. Joe Baird Dep. 9.

Several years before February 8, 2005, Baird had bought a 1937 Lincoln Zephyr from a friend in Kentucky "to make a hot rod out of it." *Id.* at 10. Lincoln Zephyrs were aerodynamic luxury cars with V-12 engines made in the late 1930s and early 1940s. Baird owned the car in his personal capacity and stored it at the industrial park. After buying some parts for the car, Baird decided to sell it. The car had an out-of-state title, so Baird asked office manager Chris Scott to call the Shelbyville Police Department to request that an officer come check the Zephyr's motor number, the antique equivalent of a vehicle identification number.

The Shelbyville Police Department dispatcher directed Officer James Michael McCracken to go "to Randy's for a VIN check." McCracken Dep. 13. He had performed similar checks at the industrial park before and knew to go first to the industrial park's office. When Officer McCracken arrived, office manager Scott was on her way to the post office. She met him outside, handed him the appropriate paperwork, told him to see Baird in his shop because Baird would show him where the car was, and asked him to leave the papers on her desk when he had finished. Officer McCracken went around to Baird's shop and found that Baird was busy talking with some other men.

Baird's son told Officer McCracken that the car was in the warehouse, not the shop. Baird took Officer McCracken over to the warehouse to look at the Zephyr. Before Officer McCracken arrived, Baird had found the motor number under the car's hood. It had been covered with "a good quarter to three-eighths inch of, you know, like muddy grease." Joe Baird Dep. 13. Baird had used a putty knife and wire brush to clean the number off. Officer McCracken used Baird's flashlight to look at the number, which read H40560. Baird told him about using the putty knife and wire brush and said that anytime "you scrape something you're going to leave a mark on metal." *Id.* at 14. After looking at the number a little longer than usual, Officer McCracken signed the affidavit, under penalty of perjury, verifying the motor number. McCracken Dep. 22-23.

Officer McCracken put the paperwork on the office manager's desk, went back to the Shelbyville Police Department, and called a prosecutor. *Id.* at 20-21. He told the prosecutor that he thought the motor number had been altered. The "H" was "a good, solid impression; there were no scratches through it. The others appeared to have circular scratches or striations through them, like a grinder had whisked them away a little bit or perhaps completely and then been restamped on top of." *Id.* at 21. Unlike modern vehicle identification numbers, motor numbers in 1937 were stamped by hand, resulting in asymmetrical gaps between numbers. Beard Dep. 47-48. Officer McCracken had received some basic training at the police academy in identifying altered vehicle identification numbers and had

worked on a few antique cars privately.  McCracken Dep. 14.  He had not,
however, received any special training and was not an expert in car theft.  *Id.* at
8-9, 14.

Officer McCracken also spoke with an officer in the Indianapolis Police
Department's car theft unit.  The Indianapolis officer agreed to help Officer
McCracken take another look at the number.  She also suggested that Officer
McCracken talk to James Beard from the National Insurance Crime Bureau, an
organization funded by insurance companies to track information on and to assist
in identifying car thefts and insurance fraud.  Beard told Officer McCracken that
the manufacturer would have stamped another motor number on the Zephyr in
a secret location and that Beard could try to recover the original number using a
chemical lifting process.

That afternoon, Officer McCracken testified at a probable cause hearing in
state court seeking a warrant to search the Zephyr and for parts and paperwork
related to the Zephyr.  Officer McCracken testified that, in his opinion, someone
had altered the car's motor number:

> Q.   Okay.  So it appears to you that that has, for some reason, been
>       ground down and then numbers stamped back in over where it was
>       ground.  Is that what you're testifying to?
> A.   Yes, sir.
> Q.   Okay.  Is that a common act committed by car thieves in your
>       training uh . . . basically that they have to have a number that will

match paperwork so when they get new paperwork they'll put a new
number on it, usually in the form of a VIN tag?

A.     Yes, sir.

Probable Cause Tr. 7-8. Officer McCracken reported that he based his opinion on

his "experience helping restore vehicles and vehicle parts" as well as "the VIN

checks that I do as a police officer." *Id.* at 6. The court issued a warrant to search

the "brick 2-story building with tan trim which bears a sign reading 'Randy's Auto

Sales', as well as the outbuildings or vehicles located on the curtilage, including

but not limited to three outbuildings located to the north of said building" for all

"parts for a 1937 Lincoln Zephyr which bears the identification #H40560, a

certificate of Origin for said vehicle, any BMV paperwork regarding said vehicle,

and the engine and transmission for said vehicle." Indianapolis Def. Ex. 7. The

next morning, February 9, 2005, Officer McCracken, two other Shelbyville officers,

two Indianapolis police officers, and James Beard from the National Insurance

Crime Bureau went to the industrial park to execute this warrant.

When they arrived, Robinson was in his office in the main building.

Shelbyville Officer David Scott and Indianapolis Officers Martha Higdon and Bryan

Reed entered the office and stayed there for the rest of the search. A Shelbyville

officer held the warrant up, slapped it down in front of Robinson, and told him to

read it. Robinson Dep. 31. Robinson looked at the warrant. He told the officer

that Baird owned the car and that the search had "nothing to do with me" and

"nothing to do with Randy's Auto Sales." *Id.* at 33. Later, he got up to go through

the office's back door to talk to Officer McCracken. One of the officers in the office grabbed his arm and told him that he could not go back to be present during the search. *Id.* at 35. At some point, office manager Chris Scott and Baird's brother Tim entered the office. Officer Scott read the *Miranda* warnings to Robinson, Chris Scott, and Tim Baird. Chris Scott Dep. 26-27. When the office manager heard what the search warrant was for, she gave the officers the paperwork related to the car and told them that Baird owned the car. *Id.* at 27.

At some point, one of Robinson's employees, Bill Noah, also entered the office with a customer. The officers allowed Noah and the customer to leave the office to load mobile home parts onto a trailer during the search, but they told Robinson, Chris Scott, and Tim Baird that they were "not allowed to leave until the search was completed." Chris Scott Dep. 28; see also Robinson Dep. 36-39. Officer Higdon also told Chris Scott that she would have to accompany her to the restroom if she needed to go. Higdon Dep. 36.

Meanwhile, Officer McCracken and Shelbyville Officer Jon Renbarger drove around to Joe Baird's shop. They donned bulletproof vests and arm guards. No officer involved had reported having any suspicion that anyone at the industrial park was violent or dangerous. See Higdon Dep. 63-64; McCracken Dep. 29-30; David Scott Dep. 37-38; Reed Dep. 26; Renbarger Dep. 16-19. Nevertheless, Officer Renbarger slung a 9 millimeter submachine gun around his neck. He

entered Baird's shop and Officer McCracken followed him in.  Officer McCracken
told Baird "to get back, he didn't want any trouble.  Get everybody in the center
of the building and sit down on the concrete, don't talk."  Joe Baird Dep. 20.
Baird and everyone in the shop – including his son Anthony Baird, William
Wright, Victor Noel, and Noah Stroup – complied.

Officer Renbarger then went outside to round up anyone in the surrounding
shops and warehouse.  Derek Brown and Rodney Jeffries were working on a brick
wall near the warehouse.  Officer Renbarger, wielding his submachine gun, yelled
at Jeffries to go to Baird's shop and followed Jeffries inside.  Jeffries Dep. 10.
Officer Renbarger, again wielding his submachine gun, demanded that Brown
come with him to Baird's shop.  Brown Dep. 16.  Gill Haddix was working in
Robinson's body shop next door when he looked at the door and "there was a
police officer with a high-powered rifle pointed right" at him.  Haddix Dep. 11.
Haddix told the officer that Robinson's shop was a separate business, but the
officer got behind Haddix and took him at gunpoint to Baird's shop.  *Id.* at 12.  A
group of Amish men working near the warehouse came to Baird's shop to ask a
question.  Joe Baird Dep. 21-22.  Officer Renbarger herded them in at gunpoint
as well.  *Id.*

This group sat in the center of Baird's shop, some on the ground and others
on chairs or crates, under the supervision of Officer Renbarger and his

submachine gun.  No one remembers Officer Renbarger putting his finger on the gun's trigger; he used the gun as more of a pointer.  See Joe Baird Dep. 22.  He collected identification cards from everyone except the Amish and would not let anyone leave for any reason.  *Id.* at 23; Brown Dep. 21; Jeffries Dep. 14-15; Anthony Baird Dep. 13.  After a while, Officer Renbarger stopped pointing his gun and "it was hanging down like the guys in Iraq do."  Joe Baird Dep. 22.  Some of the tension then dissipated, and some members of the group started making jokes about the Amish being dangerous.  *Id.* at 21, 25.

While both groups were being held, Officer McCracken and James Beard from the National Crime Insurance Bureau went to the warehouse to look at the Lincoln Zephyr.  Robinson's employee Bill Noah had escaped the round-up and was loading mobile home parts onto a truck trailer with a customer outside the warehouse.  While talking on his cell phone with Robinson (who was inside the office with three police officers), Noah went past the warehouse and reported to Robinson that Beard and Officer McCracken were crouched down taking pictures behind some Ford trucks being stored in the vacant space.  Noah Dep. 21-22.  Noah also told Robinson that someone had pulled a cover off of a boat Robinson stored in the warehouse.  *Id.* at 24, 38-40.  The trucks were about twenty to twenty-five feet away from the Zephyr.  *Id.* at 37.  The boat was about thirty yards away from the Zephyr.  *Id.* at 38.  When Beard noticed that Noah was watching, Beard "looked pissed and he threw his arms up in the air and looked at the other

police officer." *Id.* at 45.   At that point, Noah went back to loading the truck trailer.

The windshields of the trucks had been smashed near where the vehicle identification number plates should have been.   The plates had been removed. Beard had previously investigated Robinson in 1999 and 2000.   Robinson had been found not guilty on charges stemming from the 1999 and 2000 investigation, but Beard believed that he had found a stolen car and a truck with an altered identification number on Robinson's property during that investigation.   Beard Dep. 17-18.   According to Beard and Officer McCracken, when they looked at the Zephyr on February 9, 2005, they could plainly see the Ford trucks.   Beard – a former police officer – suggested that Officer McCracken call a prosecutor to see if looking at the trucks was beyond the scope of their warrant.   After talking to a prosecutor, Officer McCracken photographed the trucks.[1]   He then asked Robinson about them.   From the office – via Officer Scott's radio, Robinson told McCracken that he had an oral contract with Ford to buy test vehicles and other scrap cars.   McCracken Dep. 27.   Robinson told Officer McCracken that Ford "takes a hammer and knocks a hole in the windshield and takes the VIN plate off"

---

[1]Officer McCracken testified that during the search, he talked to David Riggins, a deputy prosecutor, about the trucks and whether he could look at them.   McCracken Dep. 26.   Riggins, however, does not remember talking to Officer McCracken during the search.   Riggins Dep. 18.   Riggins' testimony does not conflict with Officer McCracken's testimony, so for purposes of summary judgment, the court accepts as true Officer McCracken's testimony that he spoke with Riggins about the trucks during the search.

of such vehicles.   Robinson Dep. 58.   Robinson also offered to show Officer McCracken paperwork verifying his ownership of the trucks.  McCracken Dep. 73.

While they were in the warehouse, Beard and Officer McCracken examined the Zephyr.   Beard located the car's hidden motor number and found that it matched the number Officer McCracken had looked at under the car's hood.   In Beard's opinion, the number under the hood looked "like somebody took a knife and scraped on it," but otherwise it "looked good."  Beard Dep. 44, 47.  They took a few pictures of the Zephyr.   Officer McCracken then went into the office to apologize to Robinson, who was very upset, "for disrupting his business." McCracken Dep. 58.  Around this time, Officers Scott, Higdon, and Reed released the group in the office, and Officer Renbarger returned the identification cards to the group he was holding in Baird's shop.  He told the group in Baird's shop that they could leave to go to lunch but could not take any tools or parts from the property.  Brown Dep. 34-35.  The plaintiffs have testified that the defendants arrived and left at various times in the morning and early afternoon on February 9, but all generally agree that they were held for about two to two and one-half hours.  Robinson Dep. 42-43; Chris Scott Dep. 28; Joe Baird Dep. 26; Brown Dep. 16, 34; Haddix Dep. 20; Jeffries Dep. 13; Noel Dep. 25; Anthony Baird Dep. 18.

A Shelbyville Police Department supervisor, Captain Rick Joseph, knew about the warrant and drove out to the industrial park the morning of the search.

While sitting in his car, he listened to the radio chatter inside for fifteen to twenty minutes and then drove around the park for about ten minutes.  Joseph Dep. 28. He returned and sat for another ten to fifteen minutes listening to the radio before leaving because he did not feel like he heard anything that required his "advice or services." *Id.* at 15, 28.  The officers did not formally arrest anyone or seize any property as a result of the search.

Plaintiffs filed this suit under 42 U.S.C. § 1983 alleging violations of the Fourth Amendment and claims under state law for trespass, negligence, and false imprisonment.  This court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1367.  Additional facts are noted below as needed, keeping in mind the standard applicable to summary judgment.

## *Discussion*

I.   *Fourth Amendment Claims Against Individuals Under Section 1983*

   A.   *Obtaining the Search Warrant*

Based on Officer McCracken's testimony, the Shelby Circuit Court issued a warrant to search the "brick 2-story building with tan trim which bears a sign reading 'Randy's Auto Sales', as well as the outbuildings or vehicles located on the curtilage, including but not limited to three outbuildings located to the north of said building" for all "parts for a 1937 Lincoln Zephyr which bears the

-14-

identification #H40560, a certificate of Origin for said vehicle, any BMV paperwork regarding said vehicle, and the engine and transmission for said vehicle." Indianapolis Def. Ex. 7.

If an officer intentionally lies or recklessly disregards the truth in presenting evidence to a judge determining whether probable cause exists, and the judge relies on those false statements in finding probable cause, the resulting search or seizure violates the Fourth Amendment of the Constitution of the United States. See *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978). Here, if the Shelby Circuit Court relied on false testimony to issue the search warrant, this court would excise the false material and evaluate the warrant only for its truthful contents. See *Franks*, 438 U.S. at 164-65. The warrant would still be valid if the remaining truthful parts of the officer's testimony sufficiently supported a finding of probable cause. See *id.* at 171-72; see generally *United States v. Johnston*, 876 F.2d 589, 592 (7th Cir. 1989) (affirming district court's denial of defendant's motion to suppress and observing that a warrant is valid if the remaining untainted assertions support a finding of probable cause). The *Franks* rule applies to both affirmative misrepresentations and intentional or reckless omissions of material fact. See *Olson v. Tyler*, 771 F.2d 277, 281 n.5 (7th Cir. 1985) (reversing summary judgment for defendants).

Here, plaintiffs assert that five misrepresentations or omissions support their *Franks* claim: (1) Officer McCracken testified falsely that he was an expert in identifying stolen antique cars; (2) Officer McCracken lied about where the Zephyr was located and who owned it; (3) Officer McCracken failed to tell the court that he had signed an affidavit verifying the Zephyr's motor number; (4) Officer McCracken failed to tell the court that Joe Baird had said he had cleaned the number off with a putty knife and wire brush before McCracken arrived; and (5) the real reason he sought a warrant to search the Zephyr supposedly was to get a better look at the Ford trucks. These assertions do not defeat the validity of the search warrant, even under the summary judgment standard.

First, the undisputed facts show that Officer McCracken did not testify falsely that he was an expert in identifying stolen antique cars. At the probable cause hearing, Officer McCracken stated that the motor number looked altered. The prosecutor asked for the basis of that opinion. Officer McCracken replied that he based his opinion on "helping restore vehicles and vehicle parts," as well as on the vehicle identification number checks he had performed as an officer. Probable Cause Tr. 6. When the prosecutor asked him how an original number would compare to an altered number, Officer McCracken stated that "the old ones would be very hard to discover. Sometimes they're filled with oil, grease, dirt" and are often filled with rust. *Id.* at 7. He did not tell the court that he had worked on only a handful of antique cars, but he also did not claim that he was especially

-16-

skilled at restoring cars.  He merely stated that he had assisted in restoring cars before.  The information that Officer McCracken related corresponded with common sense and does not support a *Franks* claim.  See *United States v. Ventresca*, 380 U.S. 102, 108 (1965) ("affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.").

Second, there is no evidence that Officer McCracken misrepresented or omitted material information about who owned the Zephyr or where it was located. Unlike the familiar, cluttered signs announcing occupants of a strip mall, the sign outside the office where Chris Scott gave Officer McCracken the Zephyr's paperwork crisply identified the building as "Randy's Auto Sales."  While the paperwork indicated that Joe Baird owned the Zephyr, Baird did not have a sign announcing his separate restoration business, and the car was located in the building identified as Randy's Auto Sales. Reed Dep. Pl. Ex. 5; Chris Scott Dep. 43-44.  At the probable cause hearing, Officer McCracken told the court that the car was located at Randy's Auto Sales.  He did not indicate who owned the car. He did not need to do so.  Perhaps an insider who understood the complex business arrangements within Robinson's and Baird's industrial park might have deduced that the Zephyr was related solely to Baird, but the undisputed facts make it easy to see how an outside observer could have thought that both the

Zephyr and Baird were a part of Randy's Auto Sales.  There is no evidence that Officer McCracken intentionally or recklessly misrepresented the Zephyr's location or owner.

Third, it is true that Officer McCracken did not tell the court that a Bureau of Motor Vehicles check of the motor number indicated that the car was not stolen or that he had signed an affidavit verifying the Zephyr's motor number.  These omissions do not nullify or undermine the probable cause finding.  Officer McCracken reported that the first character appeared to be "old and untouched for many years" but that the other characters "had some shiny grinder marks" and appeared to be stamped recently.  Probable Cause Tr. 6.  He testified that he was not aware of any legitimate reason for grinding and then re-stamping the number. *Id.* at 8.  These observations were sufficient to support a finding of probable cause based on the inference that the number had been altered, even if there was no additional evidence indicating that the car had been stolen.

Fourth, Officer McCracken did not tell the court that Joe Baird had told him that he had used a putty knife and wire brush to clean the motor number before Officer McCracken arrived.  If the court had known that Baird had done some scraping to enable Officer McCracken to see the number, the court might have inferred that the scraping caused the "shiny grinder marks" and striations that Officer McCracken observed.  Officer McCracken was not required, however, to

believe what Baird had told him.  Baird's explanation also would not have explained Officer McCracken's observation that the numbers appeared to have been re-stamped recently.  Because Officer McCracken testified that he knew of no legitimate reason to re-stamp a car's motor number, a substantial basis still existed for finding probable cause to take a closer look at the Zephyr with a more seasoned car theft analyst.  See *United States v. Kirksey*, 485 F.3d 955 (7th Cir. 2007) (affirming denial of motion to suppress and approving detention of suspected car thief after vehicle identification number check indicated car was not stolen; temporary plate number was smudged and created lingering suspicion); see generally *Johnston*, 876 F.2d at 592 (evaluating untainted circumstantial evidence to uphold probable cause finding in appeal of district court's denial of criminal defendant's motion to suppress).

Last, plaintiffs argue that Officer McCracken failed to tell the court that he sought a warrant to search the Zephyr so that he could nose around the warehouse and look at other things in "plain view."  Plaintiffs do not rely on any direct evidence to support this assertion.  They base their argument on a series of inferences.  Robinson had been convicted in Kentucky in 1975 for altering a tractor identification number.  Robinson Dep. 48.  Everyone in town knew that Robinson had been in jail before.  Anthony Baird Dep. 27.  In 1999 and 2000, police had served twenty-nine search warrants on Robinson and Baird.  Robinson Dep. 51. James Beard had participated in that investigation.  Although Robinson

was found not guilty on charges stemming from that investigation, Beard believed that he had found a stolen car and a truck with an altered identification number on Robinson's property.   Beard Dep. 17-18.   Before the 1999 and 2000 investigation involving twenty-nine search warrants, police had served thirty-four search warrants on Robinson and a salvage business he used to own and operate. Robinson Dep. 51-52.

The court assumes that Robinson may be correct in inferring that his conviction and these past searches fueled, in part, Officer McCracken's efforts to obtain a warrant to take a closer look at the Zephyr.   But there is no evidence, direct or circumstantial, that McCracken's real motive in seeking a warrant to search the Zephyr was to conduct "a general exploratory search from one object to another until something incriminating at last emerges."   *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971) (plurality opinion).   Plaintiffs' *Franks* claim does not present a genuine issue of material fact.   Officer McCracken and all other defendants are entitled to summary judgment on this *Franks* claim.

B.    *Scope of the Search*

Plaintiffs also contend that the defendants exceeded the warrant's scope by searching the Ford trucks and a boat that Robinson owned.   Only plaintiff Robinson has demonstrated (or even asserted) a reasonable expectation of privacy in those items and the warehouse in which they were stored.   See *See v. City of*

*Seattle*, 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."); *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (observing that to have standing to object to the search, a person must prove that he had a reasonable expectation of privacy "not only in the seized good, but also in the area where the good was found"). Robinson owned the trucks and boat. He jointly owned the warehouse. Guests and employees can have legitimate expectations of privacy in the places they visit and work. See generally *Minnesota v. Olson*, 495 U.S. 91, 96-98 (1990) (recognizing that a person can have a reasonable expectation of privacy in a place other than his own home); *O'Connor v. Ortega*, 480 U.S. 709, 715-18 (1987) (recognizing that within "the workplace context, this Court has recognized that employees may have a reasonable expectation of privacy against intrusions by police"). In this case, no other plaintiff has demonstrated any expectation of privacy in the Ford trucks or the boat.

The warrant clearly authorized a search for and the seizure of the Zephyr, its engine and transmission, and related papers. The truck cabs were parked about twenty to twenty-five feet away from the Zephyr. Noah Dep. 37. The boat was about thirty yards away from the Zephyr. *Id.* at 38. Both Beard and Officer McCracken looked at the truck cabs and noticed that the windshields were smashed and that someone had removed the vehicle identification numbers from

the dashboards. McCracken Dep. 25-26; Beard Dep. 31-32. One of Robinson's employees testified that after the search, he noticed that someone had pulled back the boat's cover. Noah Dep. 39-40. No one saw either Beard or McCracken remove the cover (and both deny moving it), but the cover had been in place the day before. *Id.* at 40-41.

The Fourth Amendment prohibits general, exploratory searches. See *Coolidge*, 403 U.S. at 466 (plurality opinion); *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992) ("We should not like to be understood as suggesting that a search warrant gives the executing officers a blank check. There are limits to interpretation. Otherwise the constitutional requirement that a search warrant describe with particularity the things to be seized would be a nullity."). The plain view doctrine, however, injects "some play into the joints" of the Fourth Amendment by allowing officers to seize evidence of illegal activity that they see while executing a valid warrant. *Hessel*, 977 F.2d at 302. Here, because the warrant authorized the search for and seizure of the Zephyr's engine and transmission (which were detached from the Zephyr's body), Beard and Officer McCracken were justified in walking around the warehouse looking for the engine and the transmission. The undisputed facts show that the smashed truck windshields and missing vehicle identification numbers were in plain view in places Beard and Officer McCracken were entitled to be. Rather than trying to seize the trucks, Officer McCracken called a prosecutor, talked to Robinson about

the trucks, and ended the search after satisfying himself that the windshields and missing identification numbers did not evidence illegal activity. The undisputed facts show that there was no Fourth Amendment violation in looking at the trucks.

Pulling back the boat's cover, however, is a different story. Robinson's employee testified that the cover had been securely fastened over the boat the day before the search and was pulled back after the search. Noah Dep. 39-41. A jury could infer that Beard and/or Officer McCracken pulled the cover back during their search to take a better look at the boat. Unlike the trucks, however, there is no evidence that the boat outwardly evidenced any criminal or suspicious activity, nor is there evidence showing that the boat could have been concealing objects described in the search warrant. Moving apparently legitimate objects in plain view to see whether they would provide probable cause for a seizure violates the Fourth Amendment. See *Arizona v. Hicks*, 480 U.S. 321, 325-29 (1987) (affirming order suppressing stereo seized where officer had moved the stereo to find its serial number).

Officer McCracken and James Beard are the only defendants whose actions can create liability for this violation because they are the only defendants who searched the warehouse, the trucks, and the boat. To be liable under 42 U.S.C. § 1983, they must have been acting under color of law. Officer McCracken, was

formally off-duty during the search, but he was wearing a bulletproof vest, announced he was there to execute a search warrant, and was at the industrial park the day before checking the Zephyr's motor number in his official law enforcement capacity.  A reasonable jury could easily find that on February 9, 2005, Officer McCracken was acting under color of law.  See *Pickrel v. City of Springfield,* 45 F.3d 1115, 1118-19 (7th Cir. 1995) (reversing district court's grant of motion to dismiss, and finding that off-duty officer could have been acting under color of law).

Beard argues that he was not a state actor and so cannot be liable under the Fourth Amendment or section 1983.  While Beard had been a police officer for a number of years, at the time of the search, he worked privately for the National Insurance Crime Bureau.  The Supreme Court has acknowledged that its cases "'deciding when private action might be deemed that of the state have not been a model of consistency.'" *Lebron v. National Railroad Passenger Corp.,* 513 U.S. 374, 378 (1995) (finding that Amtrak was a government entity for purposes of evaluating First Amendment claims), quoting *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting).  The Court has recognized, however, that private persons who act jointly (i.e., conspire) with state officials may themselves be liable as state actors:

> 'Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It

is enough that he is a willful participant in joint activity with the State or its agents.'

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (remanding section 1983 case for a new trial where a jury could find that private restaurant refused to serve a white woman accompanied by six black students pursuant to state-enforced custom of segregation), quoting *United States v. Price*, 383 U.S. 787, 794 (1966).

In *Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002), the Seventh Circuit determined that a private citizen who assists a police officer does not automatically become a state actor because of that assistance. In *Proffitt*, a police officer was transporting a man he had arrested to jail. The man wriggled his cuffed hands in front of him, grabbed the steering wheel, and drove the car into a ditch. A private citizen saw these events and stopped to ask the officer if he needed help. The officer said he did. During this conversation, the arrestee escaped from the car. The officer told the private citizen, "Let's take him to the ground." In the ensuing struggle, the private citizen pushed his forearm against the arrestee's neck repeatedly and ended up killing him. Recognizing that private citizens who conspire with law enforcement officials in unconstitutional conduct and those who act as informal deputies are state actors, the *Proffitt* court held that "the rendering of brief, ad hoc assistance to a public officer" did not transform "a bystander into a state actor, exposing him to liability under federal law and, by doing so, discouraging people from helping the police." *Id.* at 508.

In *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344 (7th Cir. 1986) (affirming dismissal of suit, and finding no due process violation), a wholesale supplier took a security interest in a grocery's inventory and fixtures. The grocery defaulted on its loan. The supplier's lawyers and company executive obtained a court order directing the grocery to turn over the collateral and the local sheriff to assist if needed. The lawyers and executive then served the order on the grocery and took possession of the collateral without the help of the sheriff. The grocery later sued under section 1983 claiming that the supplier and its lawyers deprived the grocery of its property without due process. The *Del's* court found that the supplier and its lawyers were state actors because the "order gave Carpenter Cook the powers of the sheriff, and if Del's had resisted the attachment the sheriff would have popped in and taken over . . . ." *Id.* at 1346. The supplier and its lawyers "were in fact if not in form deputy sheriffs *pro tem.*" *Id.*

Beard's participation here was less like the "brief, ad hoc assistance" in *Proffitt* and more like the aid of an informally deputized officer as in *Del's.* Officer McCracken testified that his own role in the warehouse was to serve "more or less as security for Mr. Beard to do his work." McCracken Dep. 25. A reasonable jury could find that Officer McCracken essentially turned his search duties over to Beard, making Beard a state actor. Thus, Robinson's Fourth Amendment claim based on the alleged boat search survives summary judgment against both James

Beard and Officer McCracken. All other defendants are entitled to summary judgment on this claim.

C.    *Detentions*

Plaintiffs also challenge the detentions they endured during the search. All of the plaintiffs argue that the police lacked authority to detain them. They also challenge the length of their detentions. The individual plaintiffs held in Baird's shop (all but Robinson, Chris Scott, Tim Baird, and Bill Noah) also challenge Officer Renbarger's use of a 9 millimeter submachine gun to detain them. Because James Beard was involved only in the warehouse search, he is not liable for the Shelbyville and Indianapolis officers' detentions of plaintiffs. Likewise, Captain Joseph did not participate in the search in any way and is not liable for the actions of Officers McCracken and Renbarger simply because he supervised them.

In *Michigan v. Summers*, 452 U.S. 692, 705 (1981), the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." There, as officers arrived at Summers' house to execute a search warrant, Summers walked down the front steps. The officers asked him to help open the house and then detained him during the search. The Court observed that a detention during the execution of a search warrant in

-27-

"special circumstances, or possibly a prolonged detention," might violate the Fourth Amendment's prohibition on unreasonable seizures, but "this routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case." *Id.* at 705 n.21. Here, the warrant authorized the officers to search the industrial park's main building (which included the office and the warehouse) and the outbuildings for the Zephyr, its parts, and related paperwork. See *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (reiterating the *Summers* holding and observing that an "officer's authority to detain incident to a search is categorical"). Accordingly, under *Summers*, the officers had authority to detain all the plaintiffs as occupants of those buildings during the search authorized by the warrant.

Although the fact of the detention did not violate the Fourth Amendment, plaintiffs also challenge the length and method of detention – issues that are analyzed under the Fourth Amendment's reasonableness standard. See *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("we make explicit what was implicit in *Garner*'s analysis . . . that all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"); *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ("it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out"). The reasonableness of the length of detention is a case-by-

case evaluation, and the government must provide "an explanation for the length of the plaintiffs' detentions." *Chortek v. City of Milwaukee*, 356 F.3d 740, 746-48 (7th Cir. 2004) (affirming summary judgment for defendants where all arrested plaintiffs but one were held for more than four hours; time appeared unreasonably long, but defendants' explanation that delays resulted from backlog at processing center was undisputed).

The plaintiffs have testified that the defendants arrived and left at various times in the morning and early afternoon on February 9, but all generally agree that they were held for about two to two and one-half hours.  Robinson Dep. 44; Chris Scott Dep. 28; Joe Baird Dep. 26; Brown Dep. 16, 34; Haddix Dep. 20; Jeffries Dep. 13; Noel Dep. 25; Anthony Baird Dep. 18.  Defendants assert that according to the Shelbyville dispatch records, see Elliott Aff. Ex. A, the search and detentions lasted only one hour.  For purposes of summary judgment, however, the court must accept plaintiffs' testimony that the search and detentions lasted two to two and one-half hours.  Defendants explain that the length of detention was reasonable because during that time, the officers served the warrant on both Robinson and Baird, rounded up the plaintiffs, found the Zephyr's hidden motor number, talked with a prosecutor about the Ford trucks, and photographed the Zephyr and the trucks.  In light of the defendants' unrebutted explanation, the length of the detentions – while perhaps not as short as if the defendants had conducted a more efficient search – was reasonable under the Fourth Amendment.

See generally *Mena*, 544 U.S. at 100 (approving two to three hour detention during search for weapons); *Gramenos v. Jewel Companies*, 797 F.2d 432, 436-37 (7th Cir. 1986) (reversing summary judgment for defendants on excessive detention claim where "the amount of time it would take reasonably diligent officers to complete" the administrative duties defendants claimed explained the detention did not equal the length of the detention).

A jury could find, however, that Officer Renbarger's use of a 9 millimeter submachine gun to detain the group in Joe Baird's shop was not reasonable under the circumstances. In *Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000) (reversing dismissal of section 1983 claim), a police officer obtained a warrant to search for crack cocaine and for a man named Troy in what he thought was a single family residence. The building actually contained three apartments. The resident of the first apartment (and owner of the building) informed the police that there were three apartments, that no one named Troy lived there, that she did not know anyone named Troy, and that an older man who had recently been very ill lived in the second apartment. The officers then went around to the side entrance of the second apartment, broke down the door without announcing their presence in any way, found the older man, and pointed a gun at his head. The officer with the gun kept it pointed at the man's head for at least ten minutes.

The district court had dismissed for failure to state a claim, and the Seventh Circuit reversed.  The appellate court observed that pointing a gun at a person's head may constitute deadly force and that an officer may not use deadly force "'absent probable cause that the suspect is dangerous or has committed a violent crime.'"  *Id.* at 774, quoting *McDonald v. Haskins,* 966 F.2d 292, 295 (7th Cir. 1992) (affirming denial of motion to dismiss section 1983 excessive force claim based on qualified immunity defense where officer had held gun to nine-year-old child's head and threatened to pull the trigger during search); cf. *Wilkins v. May,* 872 F.2d 190, 194-95 (7th Cir. 1989) (observing that due process clause governs post-arrest and pre-conviction treatment:  "Where the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution.").

Here, like the plaintiffs in *Jacobs* and *McDonald*, the plaintiffs detained in Joe Baird's shop were not being arrested.  They were only detained during the execution of a search warrant.  The officers had no objective reason to believe that anyone on the property was dangerous.  Higdon Dep. 63-64; McCracken Dep. 29-30; David Scott Dep. 37-38; Reed Dep. 26; Renbarger Dep. 16-19.  The officers were simply checking a motor number that Officer McCracken believed might have been altered.  As plaintiff Haddix stated:  "I feel like when the people in charge in our own city can come in and do that, it makes you feel kind of like what other

people feel in other countries that get run around by their out-of-line – just don't seem right for our country for that to be for no good reason." Haddix Dep. 15.

In this country, the measures police take to perform their investigatory and protective duties must be commensurate with the objective level of danger "posed to the officers or any other member of the community." *Jacobs*, 215 F.3d at 774; see also *Los Angeles County v. Rettele*, 550 U.S. —, 127 S. Ct. 1989, 1992-93 (2007) (per curiam) (observing that the Fourth Amendment requires balancing personal liberty rights with society's need to protect its members from harm); *Mena*, 544 U.S. at 99-100 (approving two to three hour detention of Mena in handcuffs during search for weapons because the government's safety interests outweighed the marginal intrusion on Mena's liberty).  In this case, plaintiffs posed no known physical danger and minimal speculative danger to defendants while they examined the Zephyr's motor number.  A reasonable jury could find that it was objectively unreasonable for Officer Renbarger to round up and detain the individuals in Joe Baird's shop by aiming a submachine gun at them.  See *Jacobs*, 215 F.3d at 773-74; *McDonald*, 966 F.2d at 294-95.  Only the plaintiffs held in Baird's shop (Joe Baird, Anthony Baird, Derek Brown, Gill Haddix, Rodney Jeffries, and Victor Noel) have standing to assert this unreasonable detention claim against Officer Renbarger.  All other defendants are entitled to summary judgment on this claim.

II.     *Qualified Immunity for Federal Claims*

Under section 1983, even when an officer has arguably violated a person's constitutional rights, the officer is immune generally from the "fear of personal monetary liability" and from harassing litigation that "will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). A government official's immunity for individual liability is limited or qualified, however, so that it does not apply where the facts a plaintiff alleges and then proves (1) reveal a constitutional violation (2) according to "clearly established" law at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Marshall v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002).  A violation is "clearly established" where (1) the violation is so obvious that a reasonable officer would know that his actions violated the Constitution, or (2) a closely analogous case establishes that the conduct is unconstitutional.  *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001); *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000) ("a plaintiff need not always identify a closely analogous case" to show that a violation is "clearly established").

As discussed above, if a jury finds that Officer McCracken searched Robinson's boat, then he violated Robinson's Fourth Amendment rights by searching the boat without a warrant and without any indication that the boat evidenced criminal activity.  Whether that happened is disputed, but the court must give plaintiff Robinson the benefit of the factual conflicts at this stage.  In

deciding questions of qualified immunity, it is important to keep in mind that the standard is whether the contours of the right were sufficiently clear that a reasonable officer in the situation would have understood that the (alleged) actions violated the constitutional right under the factual circumstances. *McDonald*, 966 F.2d at 293, citing *Anderson v. Creighton*, 483 U.S. at 640.

The applicable boundaries of the plain view doctrine – which prohibit officers from disturbing apparently legitimate objects without a warrant – were sufficiently clearly established in 2005. See *Soldal v. Cook County*, 506 U.S. 56, 66 (1992) ("Thus, in the absence of consent or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the probable-cause standard . . . ."); *Arizona v. Hicks*, 480 U.S. at 325-29 (holding in 1987 that plain view doctrine did not authorize officers to move objects to search what was not in plan view).    Officer McCracken is not entitled to qualified immunity if plaintiffs can prove at trial that he searched Robinson's boat in the absence of a warrant or facts in plain view supporting probable cause that it provided evidence of a crime.

As a private citizen acting on behalf of the police, James Beard may, however, be entitled to qualified immunity. Whether a private citizen acting under color of law is entitled to qualified immunity depends on whether the common law had a firmly rooted tradition of immunizing private actors in Beard's position. See

*Richardson v. McKnight*, 521 U.S. 399, 404-05 (1997) (finding that privately employed prison guards were not entitled to qualified immunity). The *Richardson* Court explicitly left open the question of whether a private citizen acting under color of state law might be entitled to immunity if he was "briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Id.* at 413. At this point in the case, the parties have not made any arguments as to how the common law treated private actors in Beard's position. The court would welcome further development of this issue before trial as applied to evidence indicating that Beard searched Robinson's boat.

As discussed above, a jury could find that Officer Renbarger violated the Fourth Amendment rights of the plaintiffs held in Joe Baird's shop (Joe Baird, Anthony Baird, Rod Jeffries, Derek Brown, Gill Haddix, and Victor Noel) by rounding them up and detaining them at gunpoint. It is quite clear that the Fourth Amendment requires the police to effect reasonable seizures. See *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("we make explicit what was implicit in *Garner*'s analysis . . . that all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"); *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ("it is plain that reasonableness depends on not only when a seizure is made, but also

how it is carried out"). That level of generality, however, does not resolve the issue of qualified immunity.

Some constitutional violations certainly fall within the gray zones of the "factbound morass of 'reasonableness'" analysis. *Scott v. Harris*, 550 U.S. —, 127 S. Ct. 1769, 1778 (2007) (finding officer's decision to bump driver off road after long and dangerous high-speed chase was reasonable as a matter of law). But the law is clearly established that other seizures are unreasonable. See *Payne v. Pauley*, 337 F.3d 767, 778-79 (7th Cir. 2003) (finding that officers were not entitled to qualified immunity for excessive force claim at summary judgment stage based on facts seen in light most favorable to plaintiff); *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("If the facts are as alleged, a reasonable police officer in the position of these defendants would have known for sure that his actions violated the Constitution, and so the defendants cannot shelter behind the defense of official immunity.").

If plaintiffs prove at trial that Officer Renbarger used and aimed a submachine gun during the 2005 search to detain several people, none of whom were suspected of anything more dangerous than altering a car's identification number, a jury could find that his actions were so unreasonable that they would violate clearly established law under the Fourth Amendment. See *Robinson v. Solano County*, 278 F.3d 1007, 1015-16 (9th Cir. 2002) (finding that while Fourth

Amendment reasonableness standard allowed court in 2002 to "recognize as a general principle that pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger," the law was not as clear in 1995 when the conduct at issue occurred); *Holland v. Harrington,* 268 F.3d 1179, 1192-93 (10th Cir. 2001) (finding that officers who held several children at gunpoint during search for evidence related to assault and reckless endangerment charges were not entitled to qualified immunity: "continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation outside the residence was not justified under the circumstances at that point"); *Jacobs,* 215 F.3d at 773-74 (reversing dismissal of section 1983 claim where man held at gunpoint "did nothing more threatening than provide the officer with his identification and ask the officer for permission to sit down"); *Baker v. Monroe Township,* 50 F.3d 1186, 1193-94 (3d Cir. 1995) (finding that detention at gunpoint during search violated Fourth Amendment: there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used"); *McDonald,* 966 F.2d at 294-95 (affirming denial of motion to dismiss section 1983 excessive force claim based on qualified immunity defense where officer had held gun to nine-year-old child's head and threatened to pull the trigger during search).

III.   *Municipal Liability*

Thus far, the court has addressed the section 1983 claims against the individual defendants.  Plaintiffs also seek relief from Shelbyville and Indianapolis. Under section 1983, a municipality "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-91 (1978).  Plaintiffs argue that Indianapolis and Shelbyville should be liable for Officer McCracken's and Officer Renbarger's alleged constitutional violations because the cities do not have written policies regulating the execution of search warrants or the detention of individuals unrelated to the investigation during a search.  Such claims based on an alleged municipal custom or policy, however, require evidence of more than a single incident of unconstitutional behavior. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (affirming defense verdict in section 1983 case); see also *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405-08 (1997) (observing that municipalities can be liable for single incidents of unconstitutional behavior only where "fault and causation were obvious").  "The absence of a policy might thus mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action." *Calhoun*, 408 F.3d at 380.

There is no evidence here that Officer McCracken's alleged search of the boat or Officer Renbarger's method of detention were widespread practices in Shelbyville, let alone in Indianapolis.   Neither the cities of Indianapolis and Shelbyville nor the Shelbyville Police Department are liable here.[2]   There is also no evidence indicating that any alleged constitutional violations were caused by any corporate policy of the National Insurance Crime Bureau, so that entity is not liable under section 1983 even if Beard might be personally liable for his own actions.   See generally *Johnson v. Dossey*, 515 F.3d 778, 782 (7th Cir. 2008) (reversing dismissal of section 1983 claim; recognizing that private corporate defendants are not vicariously liable under section 1983 but can be liable where the injury resulted from the corporation's policy, practice, or a series of bad acts that the "policy-making level of government" was bound to have noticed and failed to correct).   Accordingly, defendants Shelbyville, Indianapolis, and National Insurance Crime Bureau are entitled to summary judgment on all claims against them arising under federal law.

---

[2]Plaintiffs have agreed that the Indianapolis Police Department is not a proper defendant in this case because plaintiffs have sued Indianapolis itself.  See Docket No. 92 at 4.   The Shelbyville Police Department is also not a proper defendant here because plaintiffs have sued Shelbyville directly.

IV.   *State Law Claims*

A.   *Trespass*

Plaintiffs Robinson, Joe Baird, Shelby Industrial Park, Inc., and Randy's Auto Sales, LLC also claim that defendants trespassed under Indiana law. The Indiana Tort Claims Act grants immunity to government entities and law enforcement officers for torts committed within the scope of an officer's employment, except if the tort claimed is false arrest or false imprisonment. Ind Code § 34-13-3-3(8). Accordingly, these plaintiffs' claims for trespass can survive only against James Beard and the National Insurance Crime Bureau.

Under the doctrine of trespass ab initio, a private individual who lawfully enters a property but later abuses that authority through subsequent misconduct is deemed a trespasser from the initial entry. See *Burton v. Calaway,* 20 Ind. 469, 471-72 (1863) (applying trespass ab initio doctrine where defendant rightfully captured a stray steer but later illegally refused to turn the steer over for public sale). There is some question about whether Indiana still recognizes this relatively obscure doctrine. See *Turner v. Sheriff of Marion County,* 94 F. Supp. 2d 966, 984 n.27, 998 (S.D. Ind. 2000) (certifying question of doctrine's validity to the Supreme Court of Indiana, but state court declined to answer certified question); see generally *McGuire v. United States,* 273 U.S. 95, 98-99 (1927) (recognizing that the

"fiction" of trespass ab initio applies only in civil actions and that its extension "is not favored").

Defendants Beard and the National Insurance Crime Bureau argue that Beard lawfully entered the plaintiff's property based on the apparently legitimate authority of the search warrant. See Docket No. 81 at 19-21. The only misconduct Beard might have engaged in was his possible participation in searching Robinson's boat. Beard had entered the property lawfully, but he did not have legal authority to search the boat. See generally *Arizona v. Hicks*, 480 U.S. at 325-29. Under the doctrine of trespass ab initio, a reasonable jury could find that Beard's assistance in the search of the boat, if proved, invalidated his earlier lawful entry onto the plaintiffs' property, making him a trespasser from the start.

The Supreme Court of Indiana has held that a jury must determine whether an employer is liable under a respondeat superior theory for acts outside the scope of the employee's duties when the episode began with acts within the scope of the employee's duties. See *Stropes v. Heritage House Childrens Center of Shelbyville, Inc.*, 547 N.E.2d 244, 247-50 (Ind. 1989) (finding that jury must decide whether employer was liable under respondeat superior doctrine where employee's initial acts were within the scope of his employment but later devolved into criminal behavior). If a jury found that Beard participated in the illegal search of

the boat, the jury would need to decide whether the National Insurance Crime Bureau was liable to plaintiffs for the modest consequences of Beard's conduct that began with the authorized search of the Zephyr and then might have exceeded permissible limits. All other defendants are entitled to summary judgment on this claim.

B.   *Negligent Supervision*

Plaintiffs also claim that the municipal defendants negligently supervised their respective officers, violating Indiana law. Indiana Code § 34-13-3-3(8) grants immunity to government entities and law enforcement officers for torts committed in law enforcement unless the tort amounts to false arrest or false imprisonment. In executing the search warrant and detaining people on the scene, the officers were engaged in law enforcement subject to the statutory exception. Accordingly, Indianapolis and Shelbyville are immune from liability for negligent supervision. To the extent that this claim encompasses James Beard and the National Insurance Crime Bureau, there is no evidence that Beard or the National Insurance Crime Bureau had a duty to supervise Officers McCracken and Renbarger or any other person involved in this case. Beard was present to assist Officer McCracken examine the Zephyr's motor number. All defendants are entitled to summary judgment on this claim, although the City of Shelbyville could be liable under principles of respondeat superior if plaintiffs can prove a non-exempt tort claim against a Shelbyville officer, as discussed below.

C.   *False Imprisonment*

As noted, the Indiana Tort Claims Act does not grant tort immunity for false imprisonment claims.  See Ind. Code § 34-13-3-3(8).  The Supreme Court of the United States has determined in *Michigan v. Summers*, 452 U.S. 692, 705 (1981), that the Fourth Amendment allows officers to detain occupants of buildings being searched, but that does not necessarily mean that Indiana law follows suit.  As one panel of the Indiana Court of Appeals observed, no Indiana court has yet decided whether Indiana law allows officers to detain occupants of buildings for which they have a valid search warrant but without probable cause to seize each individual.  See *Carroll v. State*, 822 N.E.2d 1083, 1085, 1087-88 (Ind. App. 2005) (affirming on interlocutory appeal trial court's denial of defendant's motion to suppress by following rule in *Summers* on Fourth Amendment claim).

Indiana search and seizure law is generally consistent with federal law on Fourth Amendment claims.  See *Row v. Holt*, 864 N.E.2d 1011, 1016-17 (Ind. 2007) (observing that false arrest requires lack of probable cause, which turns on "whether a reasonable person, under the facts and circumstances encountered by the arresting officer, would believe that the suspect had committed or was committing a criminal offense"); *Sears v. State*, 668 N.E.2d 662, 666-67 (Ind. 1996) (recognizing on direct criminal appeal that officers may conduct a search incident to lawful arrest without a warrant); *Townsend v. State*, 460 N.E.2d 139, 141 (Ind. 1984) (recognizing on criminal appeal that officers may search for

weapons without a warrant prior to questioning a person).  While there are notable exceptions to this general consistency, see *Litchfield v. State*, 824 N.E.2d 356, 363-64 (Ind. 2005) (holding that Indiana law, unlike federal law, requires police to have articulable individualized suspicion of criminal activity before searching or seizing garbage left for trash collector); *Moran v. State*, 644 N.E.2d 536, 539-41 (Ind. 1994) (rejecting federal standing standard that person objecting to search must have reasonable expectation of privacy in place and object searched), the plaintiffs did not argue that the rule in *Michigan v. Summers* does not apply under Indiana law, and the time for doing so has passed.  In light of the policy considerations of public and officer safety that underlie the rule of *Michigan v. Summers*, this court predicts that the Supreme Court of Indiana would adopt the rule in *Summers* so long as the detentions were reasonable given the circumstances.  See generally *Litchfield*, 824 N.E.2d at 359-61 (recognizing that Indiana law's reasonableness analysis "has focused on both the degree of intrusion or indignity visited upon the citizen and the constraints on the detaining officer").

Following the same analysis of the federal claim above, the plaintiffs held in Joe Baird's shop have demonstrated that a jury could find that Officer Renbarger's use of a submachine gun to detain them was unreasonable.  Indiana law recognizes that an "originally reasonable detention may be denied statutory protection if the actions taken in connection with the detention become unreasonable."  *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 968 (Ind. App.

-44-

2001) (reversing summary judgment for defendants on plaintiff's false imprisonment claim). Under the Indiana Tort Claims Act, this claim shall proceed against the City of Shelbyville rather than against Officer Renbarger personally. See Ind. Code § 34-13-3-5(c)-(f). All other defendants are entitled to summary judgment on this claim.

### Conclusion

For the foregoing reasons, the only claims that survive summary judgment are (1) plaintiff Robinson's Fourth Amendment claim against Officer James Michael McCracken and James Beard for the alleged illegal search of Robinson's boat; (2) claims by plaintiffs Joe Baird, Anthony Baird, Jeffries, Brown, Haddix, and Noel under the Fourth Amendment against Officer Renbarger for unreasonable detention for using a submachine gun to detain them, and their parallel claim under state tort law against Shelbyville; and (3) the claims of Shelby Industrial Park, Randy's Auto Sales, Robinson and Joe Baird under state law for trespass against James Beard and the National Insurance Crime Bureau. Officers McCracken and Renbarger are not entitled to qualified immunity on the surviving Fourth Amendment claims because the availability of qualified immunity depends on disputed facts that must be resolved at trial.

So ordered.

Date: May 9, 2008

_David Hamilton_

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Brett P. Dvorak
OFFICE OF CORPORATION COUNSEL
bdvorak@indygov.org

Thomas R. Haley , III
JENNINGS TAYLOR WHEELER & HALEY
thaley@jtwhlaw.com

Charles T. Jennings
JENNINGS TAYLOR WHEELER & HALEY
chuckj@jtwhlaw.com, chuckj@in.net

John F. Kautzman
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jfk@rucklaw.com, hal@rucklaw.com

Geoffrey C. Lambert
JENNINGS TAYLOR WHEELER & HALEY
glambert@jtwhlaw.com, postmaster@jtwhlaw.com

Susan L. Lee
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Jonathan E. Palmer
jonathan.palmer@insightbb.com, jpalmer@indylaw.com

John C. Ruckelshaus
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jcr@rucklaw.com, hal@rucklaw.com

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com